## William E. Knight's Estate.    William A. Bond's Appeal.

*Will—Testamentary capacity—Evidence.*

The fact that the testator was personally attending and successfully carrying on a retail drug business of considerable value, at the time he executed his will, and for over five years afterwards, is sufficient evidence of testamentary capacity, although the testimony showed that he was eccentric, peculiar, slovenly in his attire, conduct, conversation, and personal habits.

An issue devisavit vel non will not be awarded where the testimony to sustain it, viewed in the most favorable light, would not warrant a jury in rendering a verdict against the will.

Argued April 1, 1895.    Appeal, No. 426, Jan. T., 1895, by William E. Knight, from decree of O. C. Phila. Co., Oct. T., 1892, No. 29, refusing to grant an issue devisavit vel non. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ.    Affirmed.

Appeal from register of wills, admitting to probate a paper alleged to be the will of William E. Knight, deceased.    PENROSE, J., filed the following opinion :

" The issues asked for are :

" (1) Whether the said William E. Knight was at the time of the alleged execution of said instrument of sound disposing mind, memory and understanding, and of sufficient legal capacity to make a valid will and testament.

" (2) Whether the said William E. Knight was induced to make said paper writing by undue influence of the said James Bond or others.

" The petition by the guardian of Emily Gertrude Addy for leave to intervene, alleges that she is a grandchild of Samuel Addy, a brother of the decedent, who was known by the name

of Knight instead of Addy 'from the fact that his mother was named Mary Knight . . . the lawful wife of George Addy, who was the father of said Samuel Addy and said William Knight,' and that at the time of the alleged execution of the paper admitted to probate William E. Knight was not of sound mind, etc., capable of making a will, and that such incapacity had existed for twenty-three years and upwards.  It further averred that Emily Gertrude Addy 'is one of the heirs of the said Samuel Addy, her grandfather, who was the only brother of the said William E. Knight, deceased, and is, therefore, an heir and one of the next of kin of the said William E. Knight, deceased, and entitled to a share of the estate.'

" The answer of the proponent to the original petition denies the allegations of want of testamentary capacity and of undue influence, and also avers that the appellant has no interest such as entitles him to appeal, inasmuch as the will under which he claims was executed in November, 1870, while there was a subsequent will executed in July, 1883, in which he 'was not named nor interested.'

" The answer to the petition to intervene denies that the decedent was a brother of Samuel Addy, or that Emily Gertrude Addy is an heir or one of his next of kin.  It avers that he was at all times not only capable of making a will, but that he was 'a man of unusual intelligence, and so successful in his business that he kept the respect and confidence of those who dealt with him, and maintained from it a competent livelihood.'  It asks that the right to intervene be withheld until the petitioner shall satisfy the court that his ward is of kin to the decedent.

" Dr. James Bond, the father of James Bond and William A. Bond, the proponent and the original contestant, was a druggist.  He lived with his mother in a house of which he was the owner, at the southeast corner of Tenth and Locust streets, in this city.  He had built this house many years before, and one or more of the lower rooms were occupied as his store or place of business.  The decedent, whose mother was a sister of Mrs. Bond, was born in England, but came to this country when very young and became a member of the family of his aunt. He was sent to school for some time, and afterwards was taken by Dr. Bond into the drug store and thoroughly instructed in that business.  Dr. Bond, who married late in life, died in 18—,

leaving a widow and three children—James, William A. and Kate Bond, minors, of whom James, the eldest, was then about —— years of age.

" It does not appear from the evidence when Dr. Bond moved from the house at Tenth and Locust streets, but at some time, either while he lived or immediately after his death, Dr. Knight, as the decedent was always called, became the proprietor of the business and acquired the exclusive occupancy of the house, paying, as rent, and for the right to use various proprietary medicines, $50.00 a week.

" He seemed to have looked upon Dr. Bond as his benefactor, and always attributed his success in business and his prosperity to him. In November, 1870, while Dr. Bond's children were still in their minority, he executed a will giving his property to them in equal shares. It is under this will that William A. Bond claims the right to contest the will now in controversy. In July, 1883, Dr. Knight executed a second will, by which he gave his estate to the mother of his former beneficiaries, who, in the meantime, had become the wife of M. J. Mitcheson, Esq. In January, 1887, Mr. Mitcheson being then dead, he executed the present will, the reasons which induced his change of intention being set forth in the testimony of Mr. Mellors, by whom the will was drawn.

" For sixty-five years of his life Dr. Knight lived in the house at Tenth and Locust streets, where he carried on his business and where he died. Though he became an American citizen, he seems to have retained many of the ideas and peculiarities of an Englishman of the class to which he belonged. He was old fashioned in his notions and in his habits. In his early life he was not allowed to associate with persons of his own age or to mingle with society, and his devotion was to his business. As a natural consequence, when among strangers, he was very shy, awkward and ill at ease, though in his house where he had spent his whole life, he was playful and unrestrained, especially when surrounded, as he generally was, by persons much younger than himself. He cared little or nothing for his personal appearance. His dress was adapted more to comfort than to elegance, and was made to fit very loosely because of a physical trouble (hernia) which caused him great suffering. He was not at all particular about keeping either his face or hands clean, and

their condition as well as that of his clothing indicated in a striking way the nature of his daily avocation.  He was very kind to the poor and to those requiring assistance, and few who applied to him representing that they were distressed went away empty handed, though his gifts of this character were never extravagant.

" He was a bachelor, and after Dr. Bond removed from the house, a Mrs. Lowry came with her family to reside with him and remained until her death in 1886, and in the fall of that year Mrs. Atwood, or Mrs. Addy as she then was, took her place, bringing with her her mother and her daughter, Emily Gertrude Addy (on whose behalf the petition to intervene has been filed), then a child of about nine years of age.  Mrs. Atwood testified that Mr. Addy, her first husband, was a nephew of Dr. Knight, that he was lost at sea in 1883, and that after she became a widow Dr. Knight showed great interest in and provided for her.  She was then boarding with her sister, Mrs. Clara Collins, at whose house Dr. Knight called soon after hearing of the death of Mr. Addy.  Mrs. Collins saw him then for the first time.

" Mrs. Addy, with her daughter and mother, remained with Dr. Knight at his house, Tenth and Locust streets, until his death in June, 1892.  During the first part of this period, Dr. Knight provided everything required for the family and paid all expenses; afterwards she became the wife of Albert F. Atwood, who also became an inmate of the household.  How much he contributed in the way of support does not appear.  It was probably not much, as he was an invalid for two or three years after his marriage.

" Of the twenty witnesses examined on behalf of the contestants, two were the contestants themselves, nine were relatives of Emily G. Addy, or directly interested in having the will set aside ; one was a physician who met Dr. Knight on a single occasion several years after the execution of the will; two had been in his employ, one as an errand boy and the other as assistant in the store; another had sold shoes to him ; two others had dealt with him in business, and the others were neighbors, one of whom (Andrew Gillespie) testified strongly in favor of his capacity, and the others said nothing that in the least impugned it.

" In view of the fixed and incontrovertible fact that during all the time it is sought to have it believed that Dr. Knight was incapable of taking care of himself and disposing of his property, he was actually carrying on a business requiring the possession of the very qualities of mind which are alleged to have been wanting, it is difficult to treat with seriousness the testimony offered by the contestants. He started life, it would seem, without a dollar, and by his business ability, his industry, his frugality and his sound judgment as to investments, acquired the estate (estimated at $45,000 to $50,000) which has induced this contest. He gave personal attention to his business almost to the day of his death, and during all of the time covered by the testimony he took care not only of himself but of many of those who now assert his imbecility.

" The witnesses, whose knowledge was derived from seeing him in his own house, speak of his ill-fitting clothes ; his dirty hands and face ; his habit of helping himself at table and eating with his fingers; his indistinctness of speech ; his inability to ' carry on a connected intelligent conversation ;' his fondness for repeating the same story, though without point and often vulgar or obscene in its character; his laughing at his own jokes ; his willingness to sleep in a dirty, cluttered-up little room adjoining his shop ; his purchase of old bottles, etc.

" His sufferings from hernia sufficiently account for the ' bagginess ' of his clothing (if it is necessary to account for it), and for his habit, referred to by some of the witnesses, of allowing his trousers to be unbuttoned (though concealed by his shop apron) while in the house ; his indistinctness of speech, if it existed, was the result of loss of teeth ; his willingness to put up with the dirt and discomfort of the place in which he slept was, probably, because having begun it when a lad in the employ of Dr. Bond he had kept it up from habit and without realizing a condition apparent to other persons, and because, perhaps, it was easier for him when called upon by customers during the night to attend in the store than if he had slept in the upper and more remote part of the house ; his alleged inability to carry on a connected conversation may have arisen from want of congeniality with those who assert the fact, or possibly from their own deficiencies in this respect; and so on with the other peculiarities referred to in the testimony.

" As to his dirty appearance and his habit of repeating his
jokes, it is not many years since a popular witticism, very often
repeated by men whose soundness of intellect was never ques-
tioned, attributed any unusual muddiness in the waters of the
Schuylkill to the ablutions of a most eminent citizen (also a
druggist) distinguished no less for his ability and public spirited-
ness than for his contempt for the effeminacy which regarded
personal cleanliness as any part of one's social duty.

" To all the witnesses who spoke of any peculiarity on the
part of Dr. Knight, the following questions were put: ' From
your actual knowledge of Dr. Knight, do you consider him fit
or unfit to make a will?' ' From your actual knowledge of
Mr. Knight as you have testified here to-day, do you consider
him fit or unfit to make a will?' ' From your observation of
Mr. Knight for the time you have known him, what is your
opinion as to whether he was of sane or unsound mind?' and
' Do you consider him of sane mind, competent to make a will,
to take care of himself and property?' These questions will
be found fully set forth in the testimony of Thomas W. Mc-
Clennan (page 149–150), a clerk or salesman in a shoe store,
whose reason for any opinion he might have upon the subject
was based largely upon the fact that in summer Dr. Knight
bought wool-lined shoes, several sizes too large, which he never
laced up, while in the spring he would ' buy light colored shoes
with rubber at the side, such as you might term a Romeo, and
put them on and wear them and go out in the street and come
back again and give us candy, buying maple sugar on the street,
two or three cents a piece, and come in and give them to us.'
This witness was also one of those who testified that Dr.
Knight ' was not able to carry on a sustained connected con-
versation.'

" The questions were objected to; and as the objection was
sustained, we do not know what the answer would have been,
though it may be assumed that it would have been very
decidedly in favor of the contestants. But it appeared from the
testimony of every one of these witnesses, in spite of any
opinion so asserted, that Dr. Knight's memory was wholly
unimpaired, that he did take care of himself and his property,
and that he was of extremely accurate business habits. It is
true they said that he kept no books of account, at least, that

they saw none; yet he always remembered what his securities were, where they were kept, when they fell due, and where to go to collect them. He had his box in the Fidelity Company, and always attended in person to looking after its contents. He sometimes paid small bills in small installments, taking the money as it came into the store; but he always remembered to pay them; never forgot what part had been paid, and never offered to pay a second time after payment in full.

" This last statement is not quite correct; there was one occasion, only one, when he did offer to pay a second time. A sister of Mrs. Attwood, Mrs. Collins, for a year or more, about three years before his death, did his washing (for it seems he did have washing done, notwithstanding what the witnesses, many of them relations or connections of the laundress, say to the contrary), and once when he had paid her for a week's wash he afterwards offered payment a second time to her husband. The bill, it is probable, was not a very large one.

" One of the reasons stated by Mrs. Collins for her opinion as to the testamentary capacity of Dr. Knight, and his ability to take care of himself was, that when he called at her house, soon after the death of Mrs. Attwood's first husband, to see her (Mrs. Attwood), he made a second visit in the course of a short time, bringing with him for her ' a second-hand picture and soup ladle; ' but, as Mrs. Attwood, one of the witnesses most relied on by the contestants, makes no reference to this occurrence, it is fair to assume that the incongruity of the gift was less real than apparent. The picture appears to have had some merit, as it is still preserved after a lapse of ten or twelve years.

" There was no evidence whatever of undue influence, and Mrs. Attwood, whose testimony shows that Dr. Knight's memory was unimpaired almost to the day of his death, shows very strikingly the groundlessness of the assertion that he was easily persuaded to dispose of his property. A month or two before he died, she says (page 40): ' I put the question to him as to how much he was worth, and I never knew until that time; and he said about $45,000.' She often spoke to him about making a will, and urged the claims of her daughter, Emily Gertrude Addy, and of herself. The daughter appears to have been still more importunate. Her aunt, Mrs. Braker, who tes-

tified in her behalf, says: ' Gerty used to say, "Now, uncle, I think you are awful mean, not to have those papers fixed." There was a life insurance she always understood she was to have—the doctor's life insurance.  He would say, " Hush, hush! I will have that all right!" ' It is evident that all of this was long after the will now in controversy, and it is evident, also, that no doubt was entertained at that time upon the subject of the testator's competency to dispose of his property.

" It is proper to notice that, although Mr. William A. Bond was called to testify in his own favor, he gave no intimation of an opinion adverse to the capacity of Dr. Knight to make a will; nor, though he had known him ever since he was born, did he state, nor was he asked to state, a single instance of irrationality or inability to take care of himself and his property.

"It is scarcely necessary to refer to the evidence in support of the will.  Many witnesses of the highest respectability and intelligence bore testimony as to the intellectual ability of Dr. Knight.  Many of them were his neighbors and lifelong acquaintances, who had shown their confidence in the most practical manner by dealing at his store and having prescriptions for themselves and their families compounded by him in preference to his assistants.  Among these witnesses were Major J. Lewis Good, a member of the board of health; Mr. Peter P. Breen, formerly acting treasurer of the mint; Coroner Ashbridge, Mr. John L. P. Wilson, Mr. Thomas S. Crofton, Mr. Paul J. Henon, Dr. S. K. Frease, Mr. Charles Watson, a salesman in the employ of Robert Shoemaker & Co., and others, whose dealings with him in the way of business had been carried on for many years.

. " The will was drawn by Joseph Mellors, Esq., in his office, from instructions then given to him by Dr. Knight in person. There was no interference or suggestion by any third person. The language of the will was substantially that used by the testator himself, the reasons which induced it being then stated by him to Mr. Mellors.  It was carefully read by him and deliberately executed in the presence of witnesses; and all of this occurred more than five years before his death, when he was not over sixty-eight years old, and when both his physical and mental condition was entirely unimpaired.

" Upon the evidence offered, no verdict against this will would be possible, and the issues asked for must, therefore, be refused.

" It is proper to add that the only evidence of relationship on the part of Emily Gertrude Addy to the testator is found in the testimony of her mother, Mrs. Atwood, from whose cross-examination it is apparent that the alleged relationship is at least the subject of very serious doubt; but in the view taken of the evidence with regard to testamentary capacity, especially as there are two wills between the one admitted to probate and any possible right under the intestate law, the question of relationship becomes wholly unimportant."

Exceptions to the report of PENROSE, J., were dismissed, and the decree dismissing appeal was affirmed.

*Error assigned* was in overruling exceptions to report of PENROSE, J.

*William Gorman, H. C. Terry* with him, for appellant, cited: Reichenbach v. Reichenbach, 127 Pa. 564; Schwilke's App., 100 Pa. 628; Cozzen's Will, 61 Pa. 196; De Haven's App., 75 Pa. 337; Palmer's Est., 6 Pa. C. C. 541; Rees v. Stille, 38 Pa. 138; Ketterer's Est., 42 Leg. Int. 501; Thomas's Est., 44 L. J. 431; Wilson's App., 99 Pa. 545; Weaver's Est., 9 Pa. C. C. 616; Carter's Will, 29 W. N. C. 436; McCann's Est., 12 Pa. C. C. 560; Dean v. Negley, 41 Pa. 317; Boyd v. Boyd, 66 Pa. 283; Frew v. Clarke, 80 Pa. 170; Cuthbertson's App., 97 Pa. 163; Rae's Est., 11 W. N. C. 77; Yardley v. Cuthbertson, 108 Pa. 395; Douglass's App., 162 Pa. 567; Herster v. Herster, 116 Pa. 612.

*J. P. Townsend* and *E. Hunn Hanson*, for appellee, were not heard, but cited in their printed brief: Dean v. Fuller, 40 Pa. 474; Titlow v. Titlow, 54 Pa. 216; Logan v. McGinnis, 12 Pa. 27; Dickinson v. Dickinson, 61 Pa. 401; Stokes v. Miller, 10 W. N. C. 241; Combs's and Hankinson's App., 105 Pa. 155; Wilson v. Mitchell, 101 Pa. 495; Tawney v. Long, 76 Pa. 115; Herster v. Herster, 122 Pa. 239; Douglass's Est., 162 Pa. 567; Miller v. Oestrich, 157 Pa. 264.

PER CURIAM, April 15, 1895:

This case came into the orphans' court on appeal from the

decision of the register of wills admitting to probate the paper alleged to be the last will of William E. Knight, deceased, and was regularly proceeded in before one of the judges of that court, who, upon consideration of the testimony introduced by the parties, came to the conclusion that there was practically no evidence of undue influence, and that the testimony relied on to prove want of testamentary capacity was quite insufficient to justify an issue. He therefore dismissed the appeals and ordered the record to be remitted to the register of wills. Exceptions to this action of the auditing judge having been filed, and duly considered by the court in banc, the same were dismissed and the decree was affirmed.

From a careful consideration of the testimony in connection with the clear and convincing report of the auditing judge and the opinion of the court below, we are satisfied there was no error in refusing to award either of the issues; nor do we think there is anything in either of the twenty-seven specifications of error that requires discussion. All the questions that are worthy of consideration have been sufficiently noticed in the report and opinion above referred to. The learned auditing judge's rulings on questions of evidence are substantially correct; and as to the effect of the testimony as an entirety, we fully concur in the conclusion, announced by the learned president of the court below, wherein he says: " The entire testimony is clear and satisfactory beyond a doubt that the testator, although eccentric, peculiar and slovenly in his conduct, conversation, personal habits and attire, was possessed of full testamentary capacity, and in the disposition of his estate exercised his free, untrammeled will." As we said in Pensyl's Appeal, 157 Pa. 465, viewing the testimony in its most favorable light, there is nothing in it that would warrant any jury in rendering a verdict against the validity of the will. The controlling questions have been so fully considered by the court below that further comment is unnecessary.

Decree affirmed and appeal dismissed with costs to be paid by appellants.